**STATE OF HAWAI'I**, Plaintiff–Appellee,v. **JOSELITO CORPUZ**, Defendant–Appellant

NO. 16168

(CR. NO. 91–2019)

SEPTEMBER 8, 1994

BURNS, C.J., HEEN, AND WATANABE, JJ.

OPINION OF THE COURT BY BURNS, C.J.

Defendant Joselito Corpuz (Corpuz) appeals the circuit court's April 27, 1992 judgment, after a jury trial, finding him guilty of Terroristic Threatening in the First Degree (TT1), Hawai'i Revised Statutes (HRS)

§ 707–716(1)(d) (1985). The court sentenced Corpuz to five years' incarceration. We affirm.

## I.

The circuit court unlawfully used the "struck jury" method to impanel the jury. *State v. Shiroma*, 9 Haw. App. 578, 855 P.2d 34, *cert. denied*, 74 Haw. 652, 857 P.2d 600 (1993). Corpuz, however, did not object to the method used to impanel the jury. Corpuz contends that the trial court's use of the "struck jury" method of selection was plain error. We disagree. As we stated in *Shiroma,* absent a showing that the error seriously affected the fairness, integrity, or public reputation of judicial proceedings or defendant's substantial rights, a trial court's use of the "struck jury" method of impaneling a jury is not plain error. Corpuz did not make the required showing.

## II.

Corpuz contends that the trial court's failure to instruct the jury on the lesser included offense of Terroristic Threatening in the Second Degree (TT2), HRS § 707–717 (1985), was plain error. We disagree.

HRS § 701–109(5) (1985) states:

> The court is not obligated to charge the jury with respect to an included offense unless there is a rational basis in the evidence for a verdict acquitting the defendant of the offense charged and convicting him of the included offense.

With respect to terroristic threatening, the relevant HRS provisions read as follows:

> **§707–715    Terroristic    threatening, defined.** A person commits the offense of terroristic threatening if he threatens, by word or conduct, to cause bodily injury to another person or

serious damage to property of another or to commit a felony:

> (1) With the intent to terrorize, or in reckless disregard of the risk of terrorizing, another person . . . .

HRS § 707–715 (1985).

**§707–716 Terroristic threatening in the first degree.** (1) A person commits the offense of terroristic threatening in the first degree if the person commits terroristic threatening:

* * *

> (d) With the use of a dangerous instrument.

* * *

HRS § 707–716(1)(d) (Supp. 1992).

> "Dangerous instrument" means any firearm, . . . or other weapon, device, instrument, material, or substance, whether animate or inanimate, which in the manner it is used or is intended to be used is known to be capable of producing death or serious bodily injury.

HRS § 707–700 (Supp. 1992).

**§707–717 Terroristic threatening in the second degree.** (1) A person commits the offense of terroristic threatening in the second degree if he commits terroristic threatening other than in section 707–716.

* * *

HRS § 707–717 (1985).

At trial, the complainant, Jason Kaoihana (Jason), and his wife, Kimberly Kaoihana (Kimberly), testified for the State. Corpuz and Rafael Caguioa (Rafael), who was

with Corpuz when the alleged crime occurred, testified in Corpuz's defense.

Kimberly testified in substance as follows. On July 29, 1991, she picked up Jason from work and drove home. Their four–year–old niece was with them. As Kimberly was parking the car makai (ocean side) of Kuakini Street near Lanakila Avenue, Kimberly and Jason noticed two boys sitting on a chair in an empty lot across the street, mauka (mountain side) of Kuakini Street, staring at them. At trial, she identified one of the boys as Corpuz. As was typical, Kimberly, Jason, and their niece crossed the street and proceeded to walk through the empty lot on their way home.

At some point, while walking through the lot, Jason asked one of the boys, "what are you guys staring at." Kimberly was walking away with her niece when Corpuz then responded to Jason, "oh why. You have a problem." Jason stood there as Corpuz walked up to him and picked up two rocks. Jason was carrying a lunch can. Corpuz said something to Jason, but Kimberly could not hear what was said. Jason then began to walk away and Corpuz followed him. Corpuz was about four feet away from Jason when Corpuz dropped the rocks and pulled out a butterfly knife, which Kimberly described as being silver and, with the blade open, about ten inches long. Corpuz opened the blade and told Jason, "oh, you want me to kill you now." Corpuz held out the knife, but did not make any stabbing motions. Jason said, "oh, no! No! No!," and ran to the house. Kimberly then called the police.

Jason's testimony basically corroborated Kimberly's story with slight differences. Jason could not remember whether Corpuz said anything to him after Corpuz picked up the rocks. Also, Jason recounted that, after Corpuz pulled out the knife, which Jason described as a silver

butterfly knife approximately eleven inches long when opened, Jason ran to a construction area located next door to his house. There, he picked up a two–by–four piece of wood approximately two and one–half feet long. However, he then dropped it because Corpuz and his companion had run away. Jason did not specify whether Corpuz and his companion left before he reached the construction area or after he picked up the two–by–four.

The testimony of Corpuz and Rafael differed from Kimberly's and Jason's. Corpuz testified that he was waiting with a companion for their friend to come home so they could go to the beach. Jason came up to them, face red and drunk, and said, "What you guys looking at," along with some "F words." Jason was carrying a cooler in his right hand and a beer can in his left. While Kimberly walked away, Jason turned toward them. Corpuz stood up and picked up two rocks to protect himself because he thought Jason was going to throw the beer at him. Jason said that he did not want any trouble. Corpuz explained what happened next:

> [Corpuz]: . . . I when drop one rock. So I pick up my — I put my left hand in my back pocket, grab the knife and show 'em.

> \* \* \*

> [Defense Counsel]: . . . Now, that knife, when you say you took it out of your pocket, what did you do with it, if anything.
> A. I was just showing it to him.
> Q. Okay, now this knife, it has a blade, right?
> A. Yes.
> Q. Did you show the blade?
> A. No.
> Q. Did you keep the knife open or closed?

A. Closed.

Q. Why did you do that? Why did you show him the knife?

A. 'cauz I was scared, you know, I was scared. I was scared. It's the first time a man came up to us and he was all drunk. I protect myself. Self–defense.

Q. Now, when you say that the man said no, I don't want any trouble, why did you have to take out the knife?

A. 'cauz he's just like he make troubles still, you know. He just walking back and running. So just keep walking. I take three step.

Q. Towards him?

A. Yeah.

Q. Okay. Why did you do that?

A. Because . . . [h]e had a beer can.

Q. In his hand?

A. Yeah.

A. He start calling me out. He said Come on! Come on! Come on, chicken. So, I just was keep on walking to him. And he went to his house pick up a two by four and start pounding on the ground.

Q. Okay. And what was he doing when he was pounding it on the ground?

A. Was saying Come on! Come on! Then I tell my friend Rafael told me let's go so we left.

Corpuz denied having said anything to Jason or threatening him in any way. When asked to respond to Kimberly's and Jason's testimony about the staring, Corpuz explained, "You sit one place you just looking around, you know, whose coming or thought that was our friend because my car always park the car across the street."

Rafael testified that he and Corpuz were waiting for a friend in the empty lot when Jason, yelling with a beer can in one hand and a cooler in the other, approached them and challenged Corpuz to a fight. Corpuz picked up two rocks and Jason ran to the construction site. Corpuz then dropped the rocks, pulled out his knife, and held it without showing the blade. Corpuz chased after Jason, who by then had picked up a stick and was waving his hand toward Corpuz calling Corpuz over to fight, and saying, "come on! Come on!" Corpuz did nothing. Rafael then told Corpuz to leave and they ran away.

TT2 can be an offense included in TT1. *See State v. Nakachi*, 7 Haw. App. 28, 31, 742 P.2d 388, 391 (1987). The question is whether there was a rational basis in the record to acquit Corpuz of TT1 and convict him of TT2. *See* HRS § 701–109(5); *State v. Kupau*, 10 Haw. App. 503 (1994), *aff'd*, 76 Hawai'i 387, 879 P.2d 492 (1994).

Corpuz contends there was a rational basis in the record for the jury to decide that, although Corpuz made a terroristic threat, he did not do so with a "dangerous instrument" as defined in HRS § 707–700. Corpuz points to Jason's testimony that Corpuz "never made any stabbing motions with the knife nor swung the knife in a slashing motion," and both defense witnesses' testimony that Corpuz "only took a closed knife out of his pocket." Thus, Corpuz argues:

> Should the jury have chosen to believe the defense version of the facts, it could have logically concluded that the manner in which Corpuz used or intended to use the knife, i.e., simply holding it while it was closed, was not known to be capable of producing death or serious bodily injury. From this conclusion, the jury would have found that there was no evidence beyond a reasonable doubt

to show that a "dangerous instrument" was used, and thus would have acquitted Corpuz of Terroristic Threatening in the First Degree.

We disagree.

A "dangerous instrument" is statutorily defined as any weapon or instrument, "which in the manner it is used or is intended to be used is known to be capable of producing death or serious bodily injury." HRS § 707–700.

Corpuz's interpretation is that a closed knife used or intended to be used only to make a terroristic threat is not a dangerous instrument because it is not known to be capable of producing death or serious bodily injury. In our view, Corpuz's interpretation ignores the words "or is intended to be used[.]"

Our interpretation is that, in the terroristic threatening context, an instrument is a dangerous instrument, as defined in HRS § 707–700, when it is known to be capable of producing death or serious bodily injury when used in the manner it is threatened to be used.

Legislative history supports our interpretation. The House Committee Report states in relevant part:

> Your Committee feels that although words rather than actual physical harm are involved, the psychological trauma resulting from such threats and the possibility that harm may actually occur justifies criminal prosecution. More severe penalties should be instituted when . . . dangerous weapons or explosives are used in connection therewith because the mere presence of a weapon in the possession of the offender is traumatic in itself and would present an imminent danger to the victim. There is a likelihood that in the event the victim resisted to the demands or threats of

the offender, the offender may elect to utilize the weapon.

Hse. Stand. Comm. Rep. No. 1382, in 1979 House Journal, at 1480.

The legislature recently included butterfly knives in the category of deadly or dangerous weapons for purposes of the concealed weapons statute, HRS § 134–51. It reads in relevant part:

> **§134–51  Deadly weapons; prohibitions; penalty.** (a) Any person, not authorized by law, who carries concealed upon the person's self or within any vehicle . . . or who is found armed with any . . . butterfly knife . . .or other deadly or dangerous weapon shall be guilty of a misdemeanor and may be immediately arrested without warrant . . . .

HRS § 134–51 (Comp. 1993).

## CONCLUSION

Accordingly, we affirm the circuit court's April 27, 1992 judgment convicting Corpuz of Terroristic Threatening in the First Degree, HRS § 707–716(1)(d).

*Joyce K. Matsumori–Hoshijo,* Deputy Public Defender, on the briefs for defendant–appellant.

*James M. Anderson,* Deputy Prosecuting Attorney, on the brief for plaintiff–appellee.