102 P.3d 1034

STATE of Hawai'i, Plaintiff–
Appellee–Respondent

v.

Mark Alan MARTINS, Defendant–
Appellant–Petitioner.

No. 25021.

Supreme Court of Hawai'i.

Dec. 20, 2004.

As Amended Jan. 3, 2005.

Joyce K. Matsumori–Hoshijo, deputy public defender, for defendant-appellant-petitioner Mark Alan Martins on the writ.

Arleen Y. Watanabe, deputy prosecuting attorney, for plaintiff-appellee-respondent State of Hawaii on the supplemental brief.

MOON, C.J., LEVINSON, NAKAYAMA, ACOBA, and DUFFY, JJ.

Opinion of the Court by LEVINSON, J.

On November 15, 2004, the defendant-appellant-petitioner Mark Alan Martins filed an application for a writ of certiorari (AWC), requesting that we review the Intermediate Court of Appeal's (ICA's) published opinion filed on October 14, 2004 (the ICA's opinion), affirming the March 1, 2002 judgment of the circuit court of the second circuit, the Honorable Reinette W. Cooper presiding, convicting him of and sentencing him for the following offenses: (1) terroristic threatening in the second degree, in violation of Hawai'i Revised Statutes (HRS) § 707–717 (1993)[1] (included offense of Count I, charging terror-

1. HRS § 707–717 provides:

**Terroristic threatening in the second degree.** (1) A person commits the offense of terroristic threatening in the second degree if the person commits terroristic threatening other than as provided in section 707–716.

(2) Terroristic threatening in the second degree is a misdemeanor.

HRS § 707–715(1) (1993) further provides:

**Terroristic threatening, defined.** A person commits the offense of terroristic threatening if the person threatens, by word or conduct, to cause bodily injury to another person or serious damage to property of another or to commit a felony:

(1) With the intent to terrorize, or in reckless disregard of the risk of terrorizing, another person[.]

HRS § 707–716 provides in relevant part:

**Terroristic threatening in the first degree.** (1) A person commits the offense of terroristic threatening in the first degree if the person commits terroristic threatening:

. . . .

(d) With the use of a dangerous instrument.

(2) Terroristic threatening in the first degree is a class C felony.

In its opinion, the ICA noted as follows:

To be convicted of Terroristic Threatening in the First Degree (Terroristic Threatening First), the State had to prove, as the jury was

istic threatening in the first degree); (2) reckless endangering in the second degree, in violation of HRS § 707–714 (1993)[2] (included offense of Count II, charging reckless endangering in the first degree); (3) place to keep a loaded firearm on a public highway, in violation of HRS § 134–6(d) (Supp.2001)[3] (Count III); (4)place to keep a firearm, in violation of HRS § 134–6(c) (Supp.2003) (Count IV), see supra note 3; and (5) promoting a detrimental drug in the third degree, in violation of HRS § 712–1249(1) (1993) (Count VI).[4] See State v. Martins, 106 Hawai'i 62, 101 P.3d 671 (Haw.App.2004).

In his application, Martins's sole contention is as follows: "The ICA gravely erred in

so instructed, beyond a reasonable doubt that the discharge of the shotgun by Martins was "known to be capable of producing death or serious bodily injury." HRS § 707–700 (1993) (definition of "dangerous instrument"); State v. Corpuz, 10 Haw.App. 584, 591, 880 P.2d 213, 216 (1994). Apparently, the jury concluded that Martins did not use or intend to use his shotgun in that manner. Terroristic Threatening in the Second Degree (Terroristic Threatening Second) can be an included offense of Terroristic Threatening First. Id. at 590, 880 P.2d at 216.

State v. Martins, [106 Hawai'i at 69, 101 P.3d at 678] (Haw.App.2004).

2. HRS § 707–714 provides:

**Reckless endangering in the second degree.** (1) A person commits the offense of reckless endangering in the second degree if the person engages in conduct which recklessly places another person in danger of death or serious bodily injury.

(2) For the purposes of this section and in addition to other applications, a person engages in conduct which recklessly places another person in danger of death or serious bodily injury when that person intentionally discharges a firearm in a populated area, in a residential area or within the boundaries or in the direction of any road, street or highway; provided that the provisions of this paragraph shall not apply to any person who discharges a firearm upon a target range for the purpose of the target shooting done in compliance with all laws and regulations applicable thereto.

(3) Reckless endangering in the second degree is a misdemeanor.

HRS § 707–713 (1993) provides:

**Reckless endangering in the first degree.** (1) A person commits the offense of reckless endangering in the first degree if the person employs widely dangerous means in a manner which recklessly places another person in danger of death or serious bodily injury or intentionally fires a firearm in a manner which recklessly places another person in danger of death or serious bodily injury.

(2) Reckless endangering in the first degree is a class C felony.

3. HRS § 134–6 provides in relevant part:

**Carrying or use of firearm in the commission of a separate felony; place to keep firearms; loaded firearms; penalty.**
. . . .

(c) Except as provided in sections 134–5 and 134–9, all firearms and ammunition shall be confined to the possessor's place of business, residence, or sojourn; provided that it shall be lawful to carry unloaded firearms or ammunition or both in an enclosed container from the place of purchase to the purchaser's place of business, residence, or sojourn, or between these places upon change of place of business, residence, or sojourn, or between these places and the following: a place of repair; a target range; a licensed dealer's place of business; an organized, scheduled firearms show or exhibit; a place of formal hunter or firearm use training or instruction; or a police station. "Enclosed container" means a rigidly constructed receptacle, or a commercially manufactured gun case, or the equivalent thereof that completely encloses the firearm.

(d) It shall be unlawful for any person on any public highway to carry on the person, or to have in the person's possession, or to carry in a vehicle any firearm loaded with ammunition; provided that this subsection shall not apply to any person who has in the person's possession or carries a pistol or revolver and ammunition therefor in accordance with a license issued as provided in section 134–9.

(e) Any person violating subsection (a) or (b) shall be guilty of a class A felony. Any person violating this section by carrying or possessing a loaded firearm or by carrying or possessing a loaded or unloaded pistol or revolver without a license issued as provided in section 134–9 shall be guilty of a class B felony. Any person violating this section by carrying or possessing an unloaded firearm, other than a pistol or revolver, shall be guilty of a class C felony.

A conviction and sentence under subsection (a) or (b) shall be in addition to and not in lieu of any conviction and sentence for the separate felony; provided that the sentence imposed under subsection (a) or (b) may run concurrently or consecutively with the sentence for the separate felony.

4. HRS § 712–1249 provides:

**Promoting a detrimental drug in the third degree.** (1) A person commits the offense of promoting a detrimental drug in the third degree if the person knowingly possesses any marijuana or any Schedule V substance in any amount.

(2) Promoting a detrimental drug in the third degree is a petty misdemeanor.

holding that the [circuit] court did not plainly err in failing to instruct the jury on the definition of a 'true threat' because the evidence of terroristic threatening was Martins' conduct of 'discharging his shotgun' and not his 'remarks.'"

On November 22, 2004, we granted certiorari in order to clarify that, pursuant to *State v. Valdivia*, 95 Hawai'i 465, 24 P.3d 661 (2001), and *State v. Chung*, 75 Haw. 398, 862 P.2d 1063 (1993), the necessity of a jury instruction defining a "true threat" applies to all terroristic threatening prosecutions regardless of whether the charge is based exclusively upon the defendant's verbal statements, the defendant's physical conduct, or some combination of the two. *See infra* section III. Insofar as the circuit court plainly erred in failing to instruct the jury as to the definition of a "true threat," the ICA gravely erred in affirming the March 1, 2002 judgment of the circuit court. *See* HRS § 602-59(b) (1993). Accordingly, we (1) reverse the ICA's opinion as to section III.B, (2) vacate the circuit court's March 1, 2002 judgment of conviction as to the offense of terroristic threatening in the second degree, and (3) remand this case to the circuit court for retrial on that count.

## I. BACKGROUND

### A. Factual Background

As a preliminary matter, we adopt the following unchallenged factual background, as set forth in the ICA's opinion:

The charges against Martins arose out of an incident that occurred on May 15, 2000. At that time, Martins was living in his car.

Martins testified that he had driven to Nklele Point on the evening of May 14, 2000. Martins planned to target shoot on the 15th. At approximately 10:00 a.m. on the 15th, Martins assembled his shotgun and placed his targets. Martins heard motorcycles approaching and walked up a hill to get to high ground.

Hazel Cappal (Cappal), Wilbert Pascua (Pascua), and Ross Baybado (Baybado) (collectively, dirt bikers) were in the area to ride a dirt bike. Cappal testified that when she and Pascua rode the dirt bike up a hill, they saw Martins. Martins repeatedly yelled at them, "[w]hat are you guys doing? Get off of my fucking land because of the cows are starving." The land was not owned by Martins; the owner was Maui Land and Pine.

Cappal testified that she and Pascua walked the bike back to the truck at the bottom of the hill; while they were waiting for Baybado, she heard eight gunshots. Pascua testified that he and Cappal walked and rode the bike back to the truck; Pascua heard six to eight gunshots while he and Cappal were at the truck. Cappal and Pascua testified that they were scared when they heard the gunshots. Baybado testified that while he was hearing the gunshots, he was running to Pascua's truck because he was scared he "might get shot or something."

The dirt bikers stopped at a vending stand on their way out, and Doreen Nakoa (Doreen), who ran the vending stand, called the police for the dirt bikers. When Martins drove by the vending stand about fifteen minutes later, Cappal got Martins' license plate number and gave it to the police.

The police stopped Martins' vehicle by the Honolua Bay lookout shortly thereafter, and the three dirt bikers identified Martins. Martins' car was towed to the Lahaina Police Station, and the police executed a search warrant on the car the following day. From the car the police recovered a Remington pump shotgun (not in a case), live ammunition and spent cartridge casings, a leafy vegetation believed to be marijuana, and a toiletry bag containing the components of a zip gun.

*Martins*, 106 Hawai'i at 67–68, 101 P.3d at 675–676 (brackets in original).

### 2. Procedural Background

The ICA also noted the following undisputed procedural background:

... On May 19, 2000, Martins was indicted for the following offenses:

Count I, Terroristic Threatening in the First Degree, in violation of Hawaii Re-

vised Statutes (HRS) § 707–716(1)(d) (1993);

Count II, Reckless Endangering in the First Degree, in violation of HRS § 707–713(1) (1993);

Count III, Place to Keep [Loaded] Firearm [on a Public Highway], in violation of HRS § 134–6 (Supp.2003);

Count IV, Place to Keep Firearm, in violation of HRS § 134–6(c) (Supp.2003);

Count V, Place to Keep Firearm Ammunition, in violation of HRS § 134–6(c) (Supp.2003); and

Count VI, Promoting a Detrimental Drug in the Third Degree, in violation of HRS § 712–1249(1) (1993).

A jury found Martins guilty of the included offense of Terroristic Threatening in the Second Degree on Count I and the included offense of Reckless Endangering in the Second Degree on Count II. The jury found Martins guilty as charged on Counts III, IV, and VI. The State dismissed with prejudice Count V (Place to Keep Firearm Ammunition).

Martins was sentenced to one year of probation on each of Counts I and II, five years of probation on each of Counts III and IV, and six months of probation on Count VI, all terms to run concurrently. The circuit court imposed ninety days of jail confinement as a special term and condition of probation.

*Martins*, 106 Hawai'i at 62–66, 101 P.3d at 671–75 (footnotes omitted).

On March 28, 2002, Martins timely filed a notice of appeal from the circuit court's March 1, 2002 judgment, guilty conviction, and probation sentence. The ICA summa-

rized Martins's arguments on appeal as follows:

On appeal, Martins contends (1) the evidence was insufficient to sustain his conviction for Terroristic Threatening in the Second Degree; (2) the circuit court committed plain error in failing to instruct the jury that the threat had to be unequivocal, unconditional, immediate, and specific in order to fall under the prohibitions of the terroristic threatening statute; (3) the evidence was insufficient to establish that, as to the included offense of Reckless Endangering in the Second Degree, Martins' conduct recklessly placed another in danger of death or serious bodily injury; (4) the evidence was insufficient to establish that, as to the offense of Place to Keep [Loaded] Firearm [on a Public Highway], Martins possessed or carried in a vehicle a loaded firearm; (5) the evidence was insufficient to establish that, as to the offense of Place to Keep Firearm, Martins was in a place other than his place of business, residence, or sojourn; (6) the prosecutor's misconduct during closing arguments in asserting that it was illegal to reside in one's car in this jurisdiction substantially prejudiced Martins' right to a fair trial; and (7) there was insufficient evidence to establish the offense of Place to Keep Firearm.

*Martins*, 106 Hawai'i at 66, 101 P.3d at 675.

In its opinion affirming the circuit court's judgment, the ICA reasoned and held, *inter alia*, as follows:

Martins contends the circuit court committed plain error in "failing to instruct the jury that the threat had to be unequivocal, unconditional, immediate, and specific" in order for the jury to return a guilty verdict on Terroristic Threatening Second.[5]

**5.** The ICA noted as follows:

The circuit court gave the following instruction as to Terroristic Threatening Second:

A person commits the offense of terroristic threatening in the second degree if, with the intent to terrorize or in reckless disregard of the risk of terrorizing another person, he threatens, by word or conduct, to cause bodily injury to another person.

There are two material elements of the offense of terroristic threatening in the second

degree, each of which the prosecution must prove beyond a reasonable doubt.
These two elements are:
1. That, on or about the 15th day of May, 2000, in the County of Maui, State of Hawaii, Mark Alan Martins threatened by word or conduct, to cause bodily injury to Wilbert Pascua, Hazel Cappal, and Ross Baybado; and
2. That Mark Alan Martins did so with the intent to terrorize or in reckless disregard of the risk of terrorizing those persons.
*Martins*, [106 Hawai'i at 69, 101 P.3d at 678].

Martins did not object to the jury instructions. Jury instructions to which no objection has been made at trial will be reviewed only "to correct errors which seriously affect the fairness, integrity, or public reputation of judicial proceedings, to serve the ends of justice, and to prevent the denial of fundamental rights." [State v.] Sawyer, 88 Hawai'i 325,] 330, 966 P.2d [637,] 642 [ (1998) ]. Martins relies on language from the Hawai'i Supreme Court decision in [State v.] Chung [, 75 Haw. 398, 862 P.2d 1063 (1993),] and notes that, with respect to spoken threats, the threats must be "sufficiently unequivocal, unconditional, immediate, and specific as to convey a gravity of purpose and an imminent prospect of execution." 75 Haw. at 417, 862 P.2d at 1073.

However, relying on its prior decision in Chung, the Hawai'i Supreme Court stated in [State v.] Valdivia [, 95 Hawai'i 465, 24 P.3d 661 (2001),] that "in a terroristic threatening prosecution, the prosecution must prove beyond a reasonable doubt that a remark threatening bodily injury is a 'true threat,' such that it conveyed to the person to whom it was directed a gravity of purpose and imminent prospect of execution." 95 Hawai'i at 476, 24 P.3d at 672 (emphasis added). Martins' reliance is misplaced, as Chung and Valdivia relate to threats by words. Because the evidence of terroristic threatening in this case was Martins discharging his shotgun in reckless disregard of the risk of terrorizing Cappal, Pascua, and Baybado, the circuit court did not plainly err in failing to instruct the jury that Martins' threat had to be a "true threat."

Martins, 106 Hawai'i at 71, 101 P.3d at 680.

Judge Watanabe filed a concurring and dissenting opinion, asserting that "the circuit court plainly erred when it failed to prove a 'true threat' instruction to the jury, as required by State v. Valdivia, 95 Hawai'i 465, 478, 24 P.3d 661, 674 (2001)." Martins, 106 Hawai'i at 74, 101 P.3d at 683. Judge Watanabe reasoned as follows:

In its answering brief, Plaintiff–Appellee State of Hawai'i (the State) concedes that the words uttered by Defendant–Appellant Mark Alan Martins (Martins) to Wilbert Pascua (Wilbert), Ross Baybado (Ross), and Hazel Cappal (Hazel) "do not constitute a 'threat' prohibited by the terroristic threatening statutes as they do not involve 'specific threats of physical injury to others.'" Answering Brief at 21–22. The State also acknowledges that

[t]he offense of Terroristic Threatening ("TT"), by its statutory language, requires at the very least words which "threaten" some form of bodily injury. Clearly, such was not the case with the words [Martins] yelled, and no testimony existed from Wilbert, Hazel, or Ross that they felt "threatened or terrorized" after [Martins] yelled at them. Therefore [Martins] could not have been convicted for TT2 by the jury based upon [the] words he spoke.

Id. at 22 (citation omitted). According to the State, it

is not arguing that the threat must always be specific and could never be implied. For instance, the same words spoken by [Martins] in the case at bar, "get off my f-ing land, you're killing the cows," simultaneously accompanied by some shaking of the fist, or some other conduct which, in and of itself would not constitute a threat, could nevertheless "imply" consequences resulting in bodily injury. Under those circumstances, a "true threat" definition would be required.

Id. (citation omitted; emphasis added).

A review of the record reveals that the circumstances that the State admits would trigger the requirement for a true threat definition are present in this case. The State's terroristic threatening case against Martins was premised on both Martins' words and subsequent conduct in firing gunshots. Indeed, the deputy prosecutor argued in closing arguments:

Now, they all testified to you that they were frightened. In fact, Ross indicated he thought he was going to get shot. And probably Hazel was the one that was most upset by the behavior. But all three were frightened and all three testi-

fied to that fact. They were, in fact, terrorized. *And it wasn't just by the guns*, although the gun, of course, basically was the operative force here that caused them to be very much afraid. *But it was also the first thing that set them off, was the conduct.*

*The words and conduct. Individual sitting on top of a hill, yelling at them, swearing at them, "Get off my f'ing land, you are killing the cattle." Other inappropriate things like that. . . .*

That upset them initially. But they were being pragmatic. They were going to go back down to the truck and wait. But when the gun started to go off, that's when they all became frightened.

Now, actions speak louder than words.

Tr. 12/19/01 at 31–32 (emphases added).

In light of the evidence adduced below, I believe it was incumbent on the circuit court to instruct the jury that Martins' threats, by words or conduct, had to be "unequivocal, unconditional, immediate and specific as to the person threatened, as to convey a gravity of purpose and imminent prospect of execution." *State v. Chung*, 75 Haw. 398, 416–17, 862 P.2d 1063, 1073 (1993) (quoting *United States v. Kelner*, 534 F.2d 1020, 1026–27 (2d Cir.1976), cert. denied, 429 U.S. 1022, 97 S.Ct. 639, 50 L.Ed.2d 623 (1976)). I would therefore vacate Martins' conviction for Terroristic Threatening in the Second Degree and remand for a new trial on that offense. In all other respects, I concur with the majority opinion.

*Martins*, 106 Hawai'i at 74–75, 101 P.3d at 683–84 (brackets and emphases in original).

On November 15, 2004, Martins timely filed his application for a writ of certiorari. On November 23, 2004, we granted certiorari.

## II. *STANDARD OF REVIEW*

Appeals from the ICA are governed by HRS § 602–59(b) (1993), which prescribes that

an application for writ of certiorari shall tersely state its grounds which must include (1) grave errors of law or of fact, or (2) obvious inconsistencies in the decision of the intermediate appellate court with that of the supreme court, federal decisions, or its own decision, and the magnitude of such errors or inconsistencies dictating the need for further appeal.

*In re Jane Doe, Born on June 20, 1995*, 95 Hawai'i 183, 189, 20 P.3d 616, 622 (2001).

## III. *DISCUSSION*

In his application, Martins maintains that the ICA gravely erred in holding that the circuit court did not plainly err in failing to instruct the jury as to the meaning of a "true threat";[6] in particular, Martins challenges the ICA's view that the "conduct" foundational to the alleged terroristic threatening was limited solely to Martins's discharge of the shotgun and did not include his remarks to Cappal, Pascua, and Baybado. Martins notes that the ICA resolved his challenge to the terroristic threatening jury instruction by "implicitly reject[ing] any of [his] statements to the three complainants as constituting a legally sufficient basis to support a conviction for terroristic threatening in the second degree." Martins further quotes Judge Watanabe's concurring and dissenting opinion, which observed that the State of Hawai'i [hereinafter, "the prosecution"] premised the terroristic threatening charge on both Martins's words and conduct. Martins notes as follows:

On appeal, the [prosecution], despite "conceding" that . . . Martins' remarks to the three complainants did not constitute terroristic threatening, acknowledged that "the same words spoken by [Martins] in the case at bar, 'get off my f—ing land, you're killing the cows,' simultaneously

6. In *Valdivia*, this court explained that a "true threat" is one that is " 'so unequivocal, unconditional, immediate[,] and specific as to the person threatened, as to convey a gravity of purpose and

imminent prospect of execution.' " 95 Hawai'i at 476, 24 P.3d at 672 (quoting *Chung*, 75 Haw. at 416–17, 862 P.2d at 1073 (quoting *Kelner*, 534 F.2d at 1027)).

accompanied by some shaking of the fist, or some other conduct which, in and of itself would not constitute a threat, could nevertheless 'imply consequences resulting in bodily injury," and that "[u]nder those circumstances, a 'true threat' definition would be required." Answering Brief (AB) [at 22, n. 3]. "A review of the record reveals that the circumstances that the [prosecution] admits would trigger the requirement for a true threat definition are present in this case." [*Martins,* [106 Hawai'i at 75, 101 P.3d at 684]].

Martins also observes that, in holding that there was sufficient evidence to support his conviction of terroristic threatening in the second degree, the ICA reasoned that "*Martins' words, combined with his conduct (repeated discharge of his shotgun), were sufficient evidence to sustain Martins' Terroristic Threatening Second conviction.*" *Martins,* 106 Hawai'i at 69, 101 P.3d at 678 (emphasis added). Based on the foregoing and pursuant to this court's decisions in *Chung* and *Valdivia,* Martins maintains that the "combination of [his] words and conduct ... required the [circuit] court to instruct the jury as to the definition of a 'true threat.' " We agree with Martins that the ICA erred in affirming the circuit court's judgment of conviction as to the offense of terroristic threatening in the second degree, but for the reasons set forth *infra.*

In its opinion, the ICA construed one sentence in *Valdivia* as establishing a bright-line rule regarding the requirement of a "true threat" jury instruction, relying upon the this court's statement that, "in a terroristic threatening prosecution, the prosecution must prove beyond a reasonable doubt that *a remark* threatening bodily injury is a 'true threat[.]' " *Martins,* 106 Hawai'i at 70, 101 P.3d at 679 (emphasis in original) (citing *Valdivia,* 95 Hawai'i at 476, 24 P.3d at 672). The ICA erred in concluding, based on the foregoing quotation of *Valdivia,* that "*Chung* and *Valdivia* relate to threats by words" alone. *Id.* Taken in context, the reasoning underlying *Valdivia* and *Chung* establishes that the requirement of a "true threat" jury instruction applies equally to all terroristic threatening prosecutions, regardless of the bases for the charges.

As a preliminary matter, we note that terroristic threatening may be based upon words, conduct, or a combination of the two. *See* HRS § 707–715, *supra* note 1. In that connection, the *Valdivia* court's explication of *Chung,* when read in context, does not limit the "true threat" requirement to verbal conduct:

... Chung was a high school teacher disgruntled with the principal of the public school at which he taught. *Chung,* 75 Haw. at 403–06, 862 P.2d at 1067–69. Chung expressed his frustration with the principal to a colleague and asserted, "[A] day doesn't pass that [I] don't feel like killing myself [.] ... I think I'll bring a gun[;] I'll shoot the principal and shoot myself." *Id.* at 403–404, 862 P.2d at 1067. On the same day, Chung made similar remarks to other colleagues and displayed a firearm and ammunition to several of them. *Id.* at 404–405, 862 P.2d at 1067–68. Chung's colleagues reported the threats to the vice principal, and the principal was advised of at least two of these reports. *Id.* at 405, 862 P.2d at 1068. Although Chung, on the day he uttered the foregoing statements, had been placed on a ten-day paid administrative leave, he nevertheless appeared at the school the following day carrying a concealed firearm and, shortly thereafter, was apprehended by two police officers. *Id.* at 405–406, 862 P.2d at 1068.

. . . .

... [W]e agreed in *Chung* with [*United States v.*] *Kelner* [, 534 F.2d 1020 (2d Cir.), *cert. denied* 429 U.S. 1022,[ 97 S.Ct. 639, 50 L.Ed.2d 623] (1976),] that a remark threatening bodily injury ceases to be constitutionally protected and ripens into a "true threat" when it is objectively susceptible to an interpretation that could induce fear of bodily injury in a reasonable recipient, at whom the remark is directed and who is aware of the circumstances under which the remark was made, because those circumstances reflect that the threatening remark was "so unequivocal, unconditional, immediate[,] and specific as to the person threatened, [that it] convey[ed] a gravity of

purpose and imminent prospect of execution." 75 Haw. at 416–17, 862 P.2d at 1073 (quoting *Kelner*, 534 F.2d at 1027). Applying the foregoing to the facts in *Chung*, we held that because (1) Chung repeatedly expressed his intention to shoot the principal at the school *while displaying a firearm and ammunition*, (2) his remarks were sufficiently and objectively alarming to impel a recipient to report them to the vice principal, and (3) *his presence at the school was unauthorized at the time*, Chung's remarks constituted "true threats." Id. at 417, 862 P.2d at 1073.

As our discussion reflects, *Chung* judicially narrowed the meaning of the word "threat," as employed in HRS § 707–715, in order to salvage the statutes defining terroristic threatening offenses from unconstitutional overbreadth. As a result, *Chung mandates that, in a terroristic threatening prosecution, the prosecution prove beyond a reasonable doubt that a remark threatening bodily injury is a "true threat," such that it conveyed to the person to whom it was directed a gravity of purpose and imminent prospect of execution. In other words, the prosecution must prove beyond a reasonable doubt that the alleged threat was objectively capable of inducing a reasonable fear of bodily injury in the person at whom the threat was directed and who was aware of the* circumstances under which · the re*marks were uttered. Under the particular circumstances of Chung,* as we have indicated, the "true threat" was "so unequivocal, unconditional, immediate[,] and specific as to the person threatened, as to convey a gravity of purpose and imminent prospect of execution." ·

*Valdivia*, 95 Hawai'i at 474–76, 24 P.3d at 670–72 (emphases added) (some brackets added and some in original). *Valdivia* did *not*, therefore, conclude that *Chung* created a bright-line rule that attaches only in terroristic threatening cases that are based solely upon verbal conduct, inasmuch as *Valdivia* interpreted *Chung* in light of its "particular circumstances," including the defendant's brandishing and display of a firearm and ammunition and his unauthorized presence on school premises. *Id.*

▮ Further to the foregoing, in *Valdivia*, a charge of terroristic threatening arose under the following circumstances:

Count 3 of the complaint charged Valdivia with first degree terroristic threatening by threatening to cause bodily injury to Officer Kawelo in reckless disregard of the risk of terrorizing the officer, in violation of HRS § 707–716(1)(c). . . . In this connection, two police officers gave chase to Valdivia after Officer Heatherly was dragged down Kalakaua Avenue. The chase ended when Valdivia collided with a green vehicle on Sunset Avenue. After the collision, Valdivia exited his vehicle; it took four police officers to subdue and handcuff Valdivia due to his resistance to being apprehended. While the officers were engaged in physically overcoming Valdivia's resistance, Valdivia asserted several times that he was "going to fucking kill" the officers; he was not, however, charged in the present matter with any offense in connection with these utterances.

Officer Kawelo was one of the officers who assisted in arresting and handcuffing Valdivia. Officer Kawelo also transported Valdivia to a hospital because Officer Heatherly (as well as another officer during the arrest) had sprayed him with pepper spray. Officer Kawelo testified that, while on the way to the hospital and, forming the basis of the charge in count 3, once when in the hospital, Valdivia threatened to "kill" him. On the drive to the hospital, Valdivia was handcuffed and was further restrained by means of a bar—which Officer Kawelo explained acted as a "seat belt" and prevented Valdivia from "mov[ing] too much"—that the officer had placed over Valdivia because he had been difficult to subdue during the arrest. In the course of the drive, Valdivia, according to Officer Kawelo, said, "I'm gonna kill you, fucker," "I'm gonna kill you," and "You're dead, Officer." Officer Kawelo testified that Valdivia's threats were interspersed with thirty-second to two-minute pauses but that Valdivia kept "threatening [him] ·all the way down to Queens Medical Center." However, because Officer Kawelo "thought

[he] had [Valdivia] restrained," Valdivia's threats on the way to the hospital did not "worr[y]" him. The prosecution did not charge Valdivia with any offense arising from these "threats" in the present matter.

Valdivia's alleged threat to Officer Kawelo once they were at the hospital, on the other hand, did "worr[y]" the officer. HPD Officer Samantha Kailihou had followed Officer Kawelo to the hospital. Together, the two officers escorted Valdivia inside and stood on either side of him while he sat and awaited treatment. According to Officer Kawelo, Valdivia turned to him and, while still handcuffed, said, "I'm gonna kill you and your police uniform." Officer Kailihou testified that Valdivia was yelling and screaming at, but not physically struggling with, the officers when they took him from Officer Kawelo's vehicle into the hospital. Officer Kailihou substantiated Officer Kawelo's testimony that, while seated and handcuffed with his hands behind his back, Valdivia looked at Officer Kawelo and stated he was "gonna kill [him]," as well as "kill [his] police uniform." . . .

*Valdivia*, 95 Hawai'i at 470–71, 24 P.3d at 666–67 (brackets in original). *Valdivia* applied *Chung* to its facts as follows:

Applying the foregoing paradigm to the present matter, *the facts that Valdivia had been pepper sprayed, arrested, handcuffed, and transported to a hospital did not, in themselves, render his remark to Officer Kawelo "equivocal." The circumstances did not inject ambiguity or doubt into, or otherwise dilute the clarity of, Valdivia's declaration, "I'm gonna kill you."*

. . . .

. . . *Given the evidence that pepper spray had little or no effect on Valdivia's power of resistance and that it required four police officers to physically apprehend him,* the jury could find that Valdivia possessed the apparent ability to carry out his threat and that the threat would rea-

sonably tend to induce fear of bodily injury in Officer Kawelo.

*Id.* at 476–77, 24 P.3d at 672–73 (emphases added). Thus, in accordance with the *Valdivia* and *Chung* analyses, we hold that the requirement of a "true threat" jury instruction is not limited to terroristic threatening prosecutions that are based solely upon verbal conduct, but rather applies in all such prosecutions, whether the threat is proved by evidence of verbal expression, motor behavior, or a combination thereof.

It is worth noting that the application of the "true threat" requirement to all terroristic threatening cases is consonant with the constitutional principle underlying *Valdivia* and *Chung*. *Valdivia* observed that

the question presented by *Chung* was identical to that addressed by the *Kelner* court, to wit, "whether an unequivocal threat which has not ripened by any overt act into conduct in the nature of an attempt is nevertheless punishable under the First Amendment [to the United States Constitution], even though it may additionally involve elements of expression."

*Valdivia*, 95 Hawai'i at 475, 24 P.3d at 671 (quoting *Chung*, 75 Haw. at 415, 862 P.2d at 1072 (quoting *Kelner*, 534 F.2d at 1026)). As recited *supra*, *Chung* adopted the Second Circuit's holding in *Kelner* and "judicially narrowed the meaning of the word 'threat,' as employed in HRS § 707–715, in order to salvage the statutes defining terroristic threatening offenses from unconstitutional overbreadth." *Id.* at 476, 24 P.3d at 672. Inasmuch as physical conduct can constitute "expression," a terroristic threatening charge predicated upon physical conduct alone can run afoul of the first amendment to the United States Constitution unless the "true threat" requirement is equally applied to all such prosecutions. Thus, as in *Chung*, our holding herein "salvage[s] the statutes defining terroristic threatening offenses from unconstitutional overbreadth" by narrowly defining the kind of expressive physical conduct upon which the prosecution may predicate a charge of terroristic threatening.[7] *Id.*

---

**7.** We also note that this jurisdiction's pattern jury instruction for terroristic threatening in the second degree is consistent with our holding in the present matter, providing as it does in relevant

part and *without limitation* that "[t]he threat on its face and in the circumstances which it is made must be so unequivocal, unconditional, immediate, and specific as to the person threat-

## IV. CONCLUSION

For the foregoing reasons, we hold that the requirement of a "true threat" jury instruction applies in all terroristic threatening prosecutions. Accordingly, we (1) reverse the ICA's opinion as to section III.B, (2) vacate the circuit court's March 1, 2002 judgment of conviction as to the offense of terroristic threatening in the second degree, and (3) remand this case to the circuit court for retrial on that count.

ened, as to convey a gravity of purpose and imminent prospect of execution." *Hawai'i Pat-*

*tern Jury Instructions—Criminal,* Instruction No. 9.32.