325 P.3d 647

**In the Interest of PP, a Minor.**

**No. CAAP–13–0000165.**

Intermediate Court of Appeals of Hawai'i.

April 30, 2014.

James S. Tabe, Deputy Public Defender, on the briefs, for Minor–Appellant.

Sonja P. McCullen, Deputy Prosecuting Attorney, City and County of Honolulu, on the briefs, for Plaintiff–Appellee.

---

FOLEY and LEONARD, JJ.; and NAKAMURA, Chief Judge, Dissenting.

Opinion of the Court by LEONARD, J.

Minor–Appellant PP (**Minor**) appeals from the Decree Re: Law Violation Petition(s) (**Decree**), entered on January 4, 2013, in the Family Court of the First Circuit (**Family Court**), wherein the Family Court found that Minor had violated Hawaii Revised Statutes (**HRS**) § 707–717(1) (1993), Terroristic Threatening in the Second Degree.[1]

On appeal, Minor contends that there was insufficient evidence to find that he violated HRS § 707–717 and that the Family Court erred by failing to ensure that Minor's waiver of the right to testify was made knowingly, intelligently, and voluntarily, in violation of *Tachibana v. State*, 79 Hawai'i 226, 900 P.2d 1293 (1995).

## I. BACKGROUND

On December 28, 2012, Petitioner–Appellee State of Hawai'i (**State**) filed Petition No. 12–469067 against Minor, alleging that Minor threatened, by word or conduct, to cause bodily injury to Jeffrey Kuewa (**Kuewa**), in reckless disregard of the risk of terrorizing him, thereby committing Terroristic Threatening in the Second Degree, in violation of HRS § 707–717(1).

Kuewa testified he was a counselor at the Central Oahu Youth Services Association (**COYSA** or the **Shelter**), which is a youth shelter in Hale'iwa. On December 26, 2012, he caught Minor smoking in his room at the Shelter and imposed an early bed time (**EBT**) of 7 p.m. on Minor for one day. Later during the same day, Minor failed to follow through with his chores in a timely manner, became upset, started screaming, and then walked out of the Shelter building to an "out of bounds" area. Kuewa imposed two more days of EBT on Minor, but did not inform Minor about the additional two days.

December 27, 2012 was Kuewa's day off, but he came into work because he forgot a personal item. While Kuewa was there, a van with another staff member, Frank Kimitch (**Kimitch**), and several youths, including

Minor, drove into the Shelter parking area. Minor got out and walked "kind of aggressively" toward Kuewa until he was about four feet away from Kuewa. Minor questioned Kuewa about the extra EBT days. Kuewa described Minor's demeanor as angry because Minor approached Kuewa with clenched fists and frowning eyebrows. Kuewa said Minor's voice was not loud, but it was really stern. Kuewa explained to Minor that the two more EBT days was a consequence of Minor's screaming and walking out of bounds. Minor said, "I thought it was for only one day." Kuewa said that Minor was missing the point of what he did after he was given the one-day consequence. On cross-examination, Kuewa testified that, when Minor asked him about the two extra days of EBT, in reference to Minor's "screaming" the day before, Kuewa compared him to a "little girl." Nevertheless, Minor just stared at him and then walked to the Shelter. The entire interaction between Minor and Kuewa took about 20 seconds. Kuewa confirmed that, after they talked, Minor walked away, went into the house, never came back toward Kuewa, and stayed in the house. Upon the prosecutor asking if he had any concern for his safety before Minor walked away, Kuewa said that he was *maybe* expecting Minor to take a swing at him.

After Minor walked away and into the Shelter, Kimitch informed Kuewa that Minor had been "talking a lot of shit about you." Kuewa testified that Kimitch told him that Minor said he would kick his ass and was going to make him his bitch by sticking his dick in his mouth. Kuewa testified that he was concerned that when he returned to work a physical altercation might happen between him and Minor. After discussing the matter with other staff members, Kuewa called a supervisor, and then called the police.

On cross-examination, Kuewa acknowledged he did not know about Minor's threatening comments until Kimitch told him. Minor did not make any threatening comments directly to Kuewa.

---

1. The Honorable William J. Nagle, III presided.

Kimitch testified that he works full-time as a teacher for the Department of Education and part-time for COYSA. At about 4 o'clock on December 27, 2012, Kimitch informed Minor that he was supposed to have EBT for three nights. Minor got upset and started punching the couch that Minor was sitting on. Kimitch testified that Minor stated that when Kuewa came in, he wanted to harm Kuewa and make him pay for the early bed time. Kimitch stated:

He said things like he was going to strip Jeff, um, make—make Jeff his bitch. He was going to—he said—he said, Jeff thinks he's big. I'm going to show him who's big. I'm going to show him my big dick. Um—at—the whole time with every breath and every statement, he was punching the couch, getting really aggressive. And, um, this went on for, like, five or ten minutes. He—he even threatened to kill Jeff, things like that.

Kimitch testified that Minor said that when he saw Kuewa, Minor was going to "get him." Although Minor carried on for what seemed like "a long time," Kimitch also testified that Minor did not raise his voice; he just sat there punching the couch, which was next to a desk that Kimitch was apparently sitting at, and spewing invectives about Kuewa. Minor continued ranting until Kimitch told Minor that he could not go to the beach until he stopped his behavior for five minutes. Minor stopped and was allowed to go to the beach, apparently without any further loss of privilege or other disciplinary action. When Minor returned from the beach approximately 45 minutes later, Kuewa was in the parking area. According to Kimitch, Minor walked up to Kuewa but did not get close enough to fight. Minor asked Kuewa about the three nights of EBT in an angry tone. After Minor left the area, Kimitch informed Kuewa about the threats and told Kuewa the reason Minor was mad at him. On cross-examination, Kimitch also testified that he (Kimitch) entered the shelter before Minor, as Minor had backed down away from Kuewa and was walking away, and he (Kimitch) proceeded with "little things, putting away the keys, [ ] checking

the messages on the phone, [ ] the preparations for dinner." It was apparently not long after that that Kimitch and Kuewa discussed Minor's earlier rant.

The defense did not call any witnesses. The Family Court found Minor committed Terroristic Threatening in the Second Degree. The Family Court stated:

The Court finds in this case that the prosecution has met its burden of proof of demonstrating beyond a reasonable doubt that the defendant did communicate threats of bodily harm to Mr. Kimitch, which were later transmitted to the complaining witness in this case. The Court's not going to go through the statements that the—the minor made.

Suffice to say, though, that the minor punctuated what he said with pumping his fists, punching the couch, and did so for a considerable period of time. That left Mr. Kimitch with the impression that the minor was very serious when he communicated the threat. And Mr. Kimitch testified that he made Mr. Kuewa aware of both what was said and the circumstances.

The complaining witness in this case, Mr. Kuewa, was justified in fearing for a likelihood of physical harm, because the [Minor] approached Mr. Kuewa with clenched fists, just as he had when he made the threat in front of Mr. Kimitch.

You know, the Court observed previously that words have consequences, especially when they are accompanied by a demonstration of an intent to make good on the threat.

On January 4, 2013, the Decree [2] was filed, detailing the terms of his probation for violating HRS § 707–717.

On January 24, 2013, Minor filed a motion for reconsideration, which the Family Court denied on February 13, 2013. At the February 13, 2013 hearing on the motion for reconsideration, the Family Court explained its ruling, in part as follows:

[I]t was undisputed at trial, that the minor made statements to Mr. Kimitch, animated statements punctuated by ges-

---

**2.** The Honorable Paul T. Murakami entered the Decree.

tures of punching the couch in a highly agitated state, that he would inflict bodily harm on Mr. Kuewa in a variety of descriptions that we need not go into here.

The fact that Mr. Kuewa was not present at the utterance of those statements does not mean that they cannot be considered as terroristic threats. The communication of the minor's words by Mr. Kimitch to Mr. Kuewa sometime later similarly does not impair the validity of the evidence in—concerning the terroristic threatening.

The real question here is whether there was a sense of—whether the threats were unequivocal, unconditional, immediate, and specific. Because we don't have a transcript, the Court's notes reflect that Mr. Kimitch testified at trial that he communicated both the circumstances of the minor's statement, including his gestures and demeanor, to Mr. Kuewa.

The Court also notes that immediately prior to Mr. Kuewa being informed by Kimitch of the minor's statements, Mr. Kuewa had a—let's just call it a—a discussion with the minor, in which the minor approached Mr. Kuewa, stood three feet from him with his hands balled in a fist, in an apparently agitated state, just as had been described by Mr. Kimitch when the threat was uttered. . . .

The other point that was in the record at trial and the Court also, you know, relies upon, the minor is not a small person. The minor is roughly 5–foot–10, 5–feet–11. He is stocky, muscular. And to the Court's observation, the minor was capable of inflicting bodily injury.

At that point, defense counsel interrupted to ask whether the Court was taking "judicial notice" that Minor was "stocky, muscular" because she did not recall that being part of the record.[3] The Court continued:

It was the Court's visual observation, but [the prosecutor] also elicited testimony from Mr. Kuewa about the minor's size.

All of those circumstances have been considered by the Court. And I would also add that those—those facts are undisputed. And the Court finds that the state-

ments of the minor, which were unequivocal, unconditional, and immediate, coupled with his agitated state at the time of the utterance, his hand gestures, his punching the couch, and his demonstration of hostility in front of Mr. Kimitch, which was communicated to Mr. Kuewa, coupled with the minor's behavior immediately prior to Mr. Kimitch communicating the minor's statements and the circumstances to Mr. Kuewa, were sufficient to—were sufficient for the Court to find that the prosecution has carried its burden of proof that the minor committed the violation of terroristic threatening in the second degree.

The prosecutor then asked the Family Court to clarify whether or not, without Minor's prior statements on the couch, that Minor's later encounter with Kuewa constituted terroristic threatening. The court stated that it did not:

No, the Court does not—the Court does not find that there was the communication of a threat on the date when the minor— that—the day after the discussion in front of Mr. Kimitch. The minor's statements to Mr. Kimitch were sufficiently unequivocal, unconditional, and immediate both as to the nature of the threat, as well as the identity of the person to—against whom the threat was made. Those qualify, under Chung, Kelner, and Valdivia. The fact that this was communicated to Mr. Kuewa at a later date after a separate encounter with the minor, the Court finds is sufficient, and the resultant concern by Mr. Kuewa for his own personal safety, is sufficient to complete the offense.

On March 12, 2013, Minor filed a notice of appeal.

## II.  STANDARD OF REVIEW
### Sufficiency of the Evidence

The standard of review for sufficiency of the evidence is well established; namely, whether, upon the evidence viewed in the light most favorable to the prosecution and in full recognition of the province of the

---

3.  Kuewa's testimony was that he (Kuewa) was 6–foot–2–inches tall and weighed 260 pounds and that Minor was 5–foot–9 or 5–foot–10 and 210 pounds.

trier of fact, the evidence is sufficient to support a prima facie case so that a reasonable mind might fairly conclude guilt beyond a reasonable doubt. Sufficient evidence to support a prima facie case requires substantial evidence as to every material element of the offense charged. Substantial evidence as to every material element of the offense charged is credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion. Under such a review, we give full play to the right of the fact finder to determine credibility, weigh the evidence, and draw justifiable inferences of fact.

*State v. Grace,* 107 Hawai'i 133, 139, 111 P.3d 28, 34 (App.2005) (block quote format changed) (quoting *State v. Ferrer,* 95 Hawai'i 409, 422, 23 P.3d 744, 757 (App.2001)).

## III. DISCUSSION

Minor contends that there is insufficient evidence to find that he committed the offense of Terroristic Threatening in the Second Degree. More specifically, Minor contends that, even when viewing the evidence adduced in the strongest light for the prosecution, as we must do, the evidence presented was insufficient (1) to support the Family Court's conclusion that Minor possessed the requisite state of mind sufficient to impose

4. HRS § 571–11(1) proceedings are not criminal cases (*see* HRS § 571–1 (2006)), but may be instituted when "any person who is alleged to have committed an act prior to achieving eighteen years of age which would constitute a violation or attempted violation of any federal, state, or local law[.]" HRS § 571–11(1) (Supp.2013). Thus, we review whether the evidence adduced was sufficient to support a conviction under the applicable penal statute.

5. HRS § 707–716 (Supp.2013) provides, in relevant part:

§ 707–716 **Terroristic threatening in the first degree.** (1) A person commits the offense of terroristic threatening in the first degree if the person commits terroristic threatening:
(a) By threatening another person on more than one occasion for the same or a similar purpose;
(b) By threats made in a common scheme against different persons;
(c) Against a public servant arising out of the performance of the public servant's official duties. ["Public servant" defined];

penal liability,[4] and (2) to support the Family Court's conclusion that Minor uttered a "true threat" that he intended to inflict bodily harm on Kuewa.

HRS § 707–717 (1993) states:

§ 707–717 **Terroristic threatening in the second degree.** (1) A person commits the offense of terroristic threatening in the second degree if the person commits terroristic threatening other than as provided in section 707–716.[5]

(2) Terroristic threatening in the second degree is a misdemeanor.

HRS § 707–715 (Supp.2013) states, in relevant part:

§ 707–715 **Terroristic threatening, defined.** A person commits the offense of terroristic threatening if the person threatens, by word or conduct, to cause bodily injury to another person or serious damage or harm to property, including the pets or livestock, of another or to commit a felony:

(1) With the intent to terrorize, or in reckless disregard of the risk of terrorizing, another person[.]

HRS § 702–206 (1993) defines the states of mind recognized by the Hawaii Penal Code, including:

(3) "Recklessly."

(d) Against any emergency medical services provider who is engaged in the performance of duty. ["Emergency medical services provider" defined];
(e) With the use of a dangerous instrument or a simulated firearm. ["Simulated firearm" defined]; or
(f) By threatening a person who:
(i) The defendant has been restrained from, by order of any court, including an ex parte order, contacting, threatening, or physically abusing pursuant to chapter 586; or
(ii) Is being protected by a police officer ordering the defendant to leave the premises of that protected person pursuant to section 709–906(4), during the effective period of that order.
(2) Terroristic threatening in the first degree is a class C felony.

Minor's charged law violation was allegedly committed on December 27, 2012. Subsequently, HRS § 707–716 was amended in 2013. However, the changes involved the use of "simulated firearms," which are not at issue here.

(a) A person acts recklessly with respect to his conduct when he consciously disregards a substantial and unjustifiable risk that the person's conduct is of the specified nature.

(b) A person acts recklessly with respect to attendant circumstances when he consciously disregards a substantial and unjustifiable risk that such circumstances exist.

(c) A person acts recklessly with respect to a result of his conduct when he consciously disregards a substantial and unjustifiable risk that his conduct will cause such a result.

(d) A risk is substantial and unjustifiable within the meaning of this section if, considering the nature and purpose of the person's conduct and the circumstances known to him, the disregard of the risk involves a gross deviation from the standard of conduct that a law-abiding person would observe in the same situation.[6]

Thus, to adjudicate Minor to be a law violator with respect to second degree terroristic threatening, the State was required to prove beyond a reasonable doubt that Minor threatened, by word or conduct, to cause bodily injury to Kuewa in reckless disregard of the risk of terrorizing him. In other words, the State was required to prove, under the circumstances presented: Minor's rant on the couch about what he was going to do to Kuewa and other actions (the conduct element); bore the attributes of a "true threat" (the attendant circumstances element); and Minor recklessly disregarded the risk that his remarks would terrorize Kuewa (the requisite state of mind). *See State v. Valdivia*, 95 Hawai'i 465, 474, 24 P.3d 661, 670 (2001) (citations omitted); *see also State*

*v. Chung*, 75 Haw. 398, 410–11, 862 P.2d 1063, 1070 (1993). These prior Hawai'i cases are helpful in analyzing Minor's argument.

## A. Prior Terroristic Threatening Cases

In *Chung*, the defendant was a teacher and the alleged victim of the terroristic threatening was the principal at his school. 75 Haw. at 402–03, 862 P.2d at 1067. Several witnesses gave testimony at grand jury proceedings. One teacher, who had been Chung's friend and colleague for over ten years, testified that over a course of about four months, Chung became preoccupied with the belief that the principal was out to get "weaker teachers." *Id.* at 403, 862 P.2d at 1067. He stated that Chung once displayed a gun and approximately three times spoke in his presence about shooting the principal. *Id.* Chung's statement caused him to be "very concerned, and dismayed, and frightened, prompting [him] to try to talk [Chung] out of it." *Id.* (internal quotation marks omitted). Chung articulated "pretty frightening stuff" including: "A day doesn't pass that I don't feel like killing myself. I think I'll bring a gun; I'll shoot the principal and shoot myself." *Id.* at 403–04, 862 P.2d at 1067 (internal quotation marks omitted; format altered).

A second teacher testified that, on the same day, but in a separate incident, Chung had entered his classroom, complained of having problems and taking too much medication, stated that he was going to shoot the principal, produced a loaded semiautomatic pistol and extra clips, and then declared he was going to kill the principal and himself. *Id.* at 404, 862 P.2d at 1067. This second teacher was so scared that he "didn't know what to do." *Id.* (internal quotation marks omitted). The next morning he reported the

6. In contrast, HRS § 702–206(4) (1993) defines "Negligently":

(a) A person acts negligently with respect to his conduct when he should be aware of a substantial and unjustifiable risk taken that the person's conduct is of the specified nature.

(b) A person acts negligently with respect to attendant circumstances when he should be aware of a substantial and unjustifiable risk that such circumstances exist.

(c) A person acts negligently with respect to a result of his conduct when he should be aware of a substantial and unjustifiable risk that his conduct will cause such a result.

(d) A risk is substantial and unjustifiable within the meaning of this subsection if the person's failure to perceive it, considering the nature and purpose of his conduct and the circumstances known to him, involves a gross deviation from the standard of care that a law-abiding person would observe in the same situation.

incident to the vice principal and they notified the police. *Id.*

Also on the same day, Chung approached a third teacher in the lunchroom and said that the administration or principal was "out to get him again." *Id.* at 404, 862 P.2d at 1067–68. Chung said, among other things, that "they weren't going to get him because he was going to take care of them" and he then "pulled out a clip from a .22 [caliber pistol]," asked the teacher "if he knew what it was, and said if the principal was going to go and if he had to go with him, he would." *Id.* at 404–05, 862 P.2d at 1068 (internal quotation marks omitted). This teacher also reported the incident to the vice principal. *Id.* at 405, 862 P.2d at 1068.

A fourth teacher was also approached by Chung that day as the teacher was watching a band concert. Chung expressed a desire to shoot the principal, produced two clips of bullets and asked, "What are you going to do? You going to call the policeman?" *Id.* (internal quotation marks omitted). The teacher reported the incident to the vice principal. *Id.*

On the same day, the principal was informed of two of Chung's threats to shoot him. *Id.*

The Honolulu Police Department (**HPD**) was called the next morning and, while the responding officer was on campus, he was informed that Chung had just come onto school property despite being placed on administrative leave the day before. *Id.* at 405–06, 862 P.2d at 1068. Officers met with Chung and recovered a semiautomatic pistol and ammunition from him. *Id.* at 406, 862 P.2d at 1068.

On the State's appeal from the dismissal of the charges against *Chung,* the Hawai'i Supreme Court held that the evidence presented to the grand jury was sufficient to support the terroristic threatening charges.[7] *Id.* at 409–15, 862 P.2d at 1070–72. In doing so, the supreme court explained:

> In the case of terroristic threatening, a threat becomes a crime only when it is coupled, *inter alia,* with a reckless disregard of the risk of terrorizing. Moreover, to be subject to criminal prosecution for terroristic threatening, the threat must be conveyed to *either the person who is the object of the threat or to a third party.* An uncommunicated threat, by definition, cannot threaten. A person making threats does not commit a crime until the threat is heard *by one other than the speaker.*

> [A]ctual terrorization is not a material element of the offense of terroristic threatening. The question is whether upon the evidence a reasonable trier of fact might fairly conclude that the defendant uttered his threats in reckless disregard of the risk of terrorizing another person.

> ... [T]he key issue is whether Chung acted in reckless disregard of terrorizing [the principal], *i.e.,* whether he consciously disregarded a substantial and unjustifiable risk that his conduct would result in such terrorization, when he communicated his threats to the teachers.

*Id.* at 412–14, 862 P.2d at 1071 (citations omitted; format altered).

The supreme court pointed to the above-referenced testimony—including the declaration to four fellow teachers that he was going to shoot/kill the principal, the display of the pistol and/or ammunition, Chung's presence on campus without authorization and in possession of the gun and loaded clips of ammunition, and "[s]ignificantly," Chung's query of "[W]hat are you going to do?"—in support of its conclusion that there was sufficient evidence that Chung consciously disregarded a substantial and unjustifiable risk that the principal might learn of the threat and be terrorized, and that his disregard of that risk involved a gross deviation from the standard of conduct of a law-abiding citizen in those circumstances. *Id.* at 414, 862 P.2d at 1072.

The supreme court also rejected Chung's argument that his statements were protected speech under the First Amendment to the United States Constitution. *Id.* at 415, 862 P.2d at 1072. The supreme court adopted the Second Circuit Court of Appeals' ratio-

---

7. Chung was charged with two forms of first degree terroristic threatening, one based on HRS § 707–716(1)(a) (more than one occasion and same or similar purpose), the second based on HRS § 707–716(1)(c) (against a public servant). *Chung,* 75 Haw. at 410, 862 P.2d at 1070.

nale in *United States v. Kelner*, wherein that court examined "whether an unequivocal threat which has not ripened by any overt act into conduct in the nature of an attempt is nevertheless punishable under the First Amendment, even though it may additionally involve elements of expression." *Chung*, 75 Haw. at 415, 862 P.2d at 1072, citing *United States v. Kelner*, 534 F.2d 1020, 1026 (2d Cir.1976) (internal quotation marks omitted). The courts noted the government's responsibility to ensure domestic tranquility, and the proper concerns raised by specific threats of physical injury coupled with the opportunity to carry out such threats, but nevertheless, stated:

> The word "threat" excludes statements which are, when taken in context, not "true threats" because they are conditional and made in jest[.] Threats punishable consistently with the First Amendment are only those which according to their language and context conveyed a gravity of purpose and likelihood of execution so as to constitute speech beyond the pale of protected vehement, caustic and unpleasantly sharp attacks.
>
> Proof of a "true threat" focuses on threats which are so unambiguous and have such immediacy that they convincingly express an intention of being carried out.
>
> So long as the threat on its face and in the circumstances in which it is made is so unequivocal, unconditional, immediate and specific as to the person threatened, as to convey a gravity of purpose and imminent prospect of execution, the statute may properly be applied.

*Id.* at 417, 862 P.2d at 1072–73 (citations omitted; format altered).

The supreme court concluded that no reasonable mind could conclude that Chung's statements did not rise to the level of "true threat" because

> Chung repeatedly expressed to his colleagues the intention of shooting or killing [the principal]. He did so at the school that [the principal] administered. He dis-

played a handgun and/or ammunition when he uttered his threats. Finally, the threats were sufficiently unequivocal, unconditional, immediate, and specific as to convey a gravity of purpose and an imminent prospect of execution; that this was the case is amply demonstrated by the facts that (1) Chung's statements were sufficiently alarming to impel his fellow teachers to transmit them to the vice principal (and, in one instance, obliquely to [the principal] himself) and for the police to be notified, (2) Chung was in possession of the concealed handgun on the premises of [the school] at the time of his arrest, and (3) Chung's presence at [the school] was unauthorized at the time.

*Id.* at 417, 862 P.2d at 1073. Accordingly, Chung's statements were not protected by the First Amendment. *Id.*

In *Valdivia*, the defendant was charged, *inter alia*, with first degree terroristic threatening[8] stemming from the following facts. A police officer, responding to an accident report, initially found Valdivia sitting on the hood of his car. 95 Hawai'i at 469–70, 24 P.3d at 665–66. After being told to remain where he was, Valdivia dashed toward the open driver's-side door of the vehicle. *Id.* at 470, 24 P.3d at 666. A struggle ensued, with Valdivia striking the officer in the face with his closed fist. *Id.* The officer pepper sprayed Valdivia, to no effect, and as the struggle continued, Valdivia pinned the officer's arm against the steering wheel. *Id.* Believing that Valdivia was pulling a knife, the officer pulled his gun. *Id.* Valdivia threw the car into drive and dragged the officer about thirty yards down the street while the officer attempted to get free. *Id.* Two other officers chased after the car, which then crashed into another vehicle. *Id.* It took four officers to physically overcome and handcuff Valdivia, due to his resistance. *Id.* Although not charged based on these particular utterances, Valdivia asserted several times that he was "going to fucking kill" the police officers. *Id.* While being transported to the hospital for treatment for the pepper spray, with

---

8. The "first degree" charge stemmed from the fact that the threats were directed at a police officer. *See* HRS § 707–716(1)(c).

thirty-second to two minute pauses, Valdivia again repeatedly threatened the transporting officer, Officer Kawelo, saying: "I'm gonna kill you, fucker," "I'm gonna kill you," and "You're dead, Officer." *Id.* at 471, 24 P.3d at 667. Because Valdivia was restrained by means of a bar that prevented him from moving too much, the officer was not worried about these threats and no charges arose from them. *Id.* After Officer Kawelo and another officer escorted Valdivia inside the hospital, while Valdivia sat waiting for treatment, he turned to Officer Kawelo and said, "I'm gonna kill you and your police uniform." *Id.* This threat did worry the officer and formed the basis of the terroristic threatening charge against Valdivia. *Id.*

On appeal from his conviction, citing *Chung,* Valdivia argued that the prosecution did not adduce substantial evidence from which a reasonable person could conclude that his remark to Officer Kawelo was so "unequivocal, unconditional, immediate, and specific as to the person threatened, as to convey a gravity of purpose and imminent prospect of execution, and, therefore, that his remark was not a true threat but, rather, constitutionally protected speech." *Id.* at 474, 24 P.3d at 670 (citations and internal quotation marks omitted). Valdivia's argument was, essentially, that there was "no realistic prospect" that he would "imminently execute" his threat or that he had the ability to do so, in light of his being pepper-sprayed, handcuffed, and under armed guard. *Id.*

The supreme court reviewed its decision in *Chung,* and the *Kelner* case, summarizing *Chung*'s guiding principles:

In other words, inasmuch as a remark, such as a joke or caustic hyperbole, is not susceptible to an interpretation that would place an objective, reasonable recipient, at whom the remark was directed and who was familiar with the context in which it was uttered, in reasonable fear for his or her personal safety, it therefore falls within the ambit of free speech protected both by the United States and Hawai'i Constitutions and cannot predicate a terroristic threatening conviction.

Thus, we agreed in *Chung* with the *Kelner* court that a remark threatening bodily injury ceases to be constitutionally protected and ripens into a true threat when it is objectively susceptible to an interpretation that could induce fear of bodily injury in a reasonable recipient, at whom the remark is directed and who is aware of the circumstances under which the remark was made, because those circumstances reflect that the threatening remark was so unequivocal, unconditional, immediate, and specific as to the person threatened, that it conveyed a gravity of purpose and imminent prospect of execution.

. . . *Chung* mandates that, in a terroristic threatening prosecution, the prosecution prove beyond a reasonable doubt that a remark threatening bodily injury is a true threat, such that it conveyed to the person to whom it was directed a gravity of purpose and imminent prospect of execution. In other words, the prosecution must prove beyond a reasonable doubt that the alleged threat was objectively capable of inducing a reasonable fear of bodily injury in the person at whom the threat was directed and who was aware of the circumstances under which the remarks were uttered.

*Id.* at 475–76, 24 P.3d at 671–72 (citations omitted; format altered).

The supreme court rejected the notion that the circumstances rendered Valdivia's remark equivocal, as well as Valdivia's argument that the "imminency" required to establish a true threat required "temporal" immediacy. *Id.* The court looked to *Kelner,* wherein the Second Circuit explained that it "was a threat's gravity of purpose and *likelihood* of execution that ultimately placed it beyond the pale of constitutionally protected expression," and a California Supreme Court case, which discussed *Kelner*'s requirement that a defendant have the "apparent ability" to carry out the threat. *Id.* at 476–77, 24 P.3d at 672–73 (citations and internal quotation marks omitted). The supreme court opined:

We agree with the California Supreme Court that the imminency required by *Kelner,* and hence by *Chung,* can be established by means other than proof that a threatening remark will be executed imme-

diately, at once, and without delay. Rather, as a general matter, the prosecution must prove that the threat was objectively susceptible to inducing fear of bodily injury in a reasonable person at whom the threat was directed and who was familiar with the circumstances under which the threat was uttered. Of course, one means of proving the foregoing would be to establish, as in *Chung* and *Kelner*, that the threat was uttered under circumstances that rendered it so unequivocal, unconditional, immediate, and specific as to the person threatened, as to convey a gravity of purpose and imminent prospect of execution. But another would be to establish that the defendant possessed the apparent ability to carry out the threat, such that the threat would reasonably tend to induce fear of bodily injury in the victim.

*Id.* at 477, 24 P.3d at 673 (citations omitted; format altered).

In this light, and "[g]iven the evidence that pepper spray had little or no effect on Valdivia's power of resistance and that it required four police officers to physically apprehend him," the supreme court held that the prosecution adduced substantial evidence that Valdivia uttered a true threat. *Id.*[9]

We also take note of *State v. Martins*, 106 Hawai'i 136, 142, 102 P.3d 1034, 1040 (2004), wherein the supreme court confirmed that the "true threat" requirement applies to all terroristic threatening prosecutions, whether based on "words, conduct, or a combination of the two:" *Id.* at 142, 102 P.3d at 1040. In *Martins*, the charges arose out of an incident that began with Martins yelling at a group of dirt bikers who had ridden up a hill where Martins was situated, "what are you guys doing? Get off of my fucking land because of the cows are starving." *Id.* at 138, 102 P.3d at 1036. It was not, in fact, Martins's land, but he had reportedly driven there and walked up the hill to set up some targets for shooting practice with his shotgun. *Id.* After two of the dirt bikers returned to their truck at the bottom of the hill, while waiting for the third one, they heard six to eight gunshots

and were scared. *Id.* When the third biker heard the shots, he ran to the truck, fearing he "might get shot or something." *Id.*

Martins was charged with various counts and, after a jury trial, found guilty of, *inter alia*, second degree terroristic threatening. *Id.* at 139, 102 P.3d at 1037. In reviewing the ICA's affirmance of his terroristic threatening conviction, the supreme court concluded that the "true threat" requirement is not limited to verbal conduct:

> [I]n accordance with the *Valdivia* and *Chung* analyses, we hold that the requirement of a true threat jury instruction is not limited to terroristic threatening prosecutions that are based solely upon verbal conduct, but rather applies in all such prosecutions, whether the threat is proved by evidence of verbal expression, motor behavior, or a combination thereof.

It is worth noting that the application of the true threat requirement to all terroristic threatening cases is consonant with the constitutional principle underlying *Valdivia* and *Chung*.... Inasmuch as physical conduct can constitute "expression," a terroristic threatening charge predicated upon physical conduct alone can run afoul of the first amendment to the United States Constitution unless the true threat requirement is equally applied to all such prosecutions. Thus, as in *Chung*, our holding herein salvages the statutes defining terroristic threatening offenses from unconstitutional overbreadth by narrowly defining the kind of expressive physical conduct upon which the prosecution may predicate a charge of terroristic threatening.[FN7]

---

[FN7]. We also note that this jurisdiction's pattern jury instruction for terroristic threatening in the second degree is consistent with our holding in the present matter, providing as it does in relevant part and *without limitation* that "[t]he threat on its face and in the circumstances which it is made must be so unequivocal, unconditional, immediate, and specific as to the person threatened, as to convey a gravity of purpose and imminent prospect of execution."

court's instructions to the jury. *Valdivia*, 95 Hawai'i at 478–79, 24 P.3d at 674–75.

---

9. The supreme court nevertheless vacated and remanded the case for a new trial on the terroristic threatening offense due to errors in the trial

*Id.* at 144, 102 P.3d at 1042–43 (citations, some internal quotation marks and original brackets omitted).

## B. The Sufficiency of the Evidence Against Minor

■ Minor's first argument [10] is that there was insufficient evidence that Minor acted in "reckless disregard" of terrorizing anyone, *i.e.*, that he consciously disregarded a substantial and unjustifiable risk that his words and/or conduct would terrorize Kuewa. We agree. The Hawai'i Supreme Court has stated:

> The difference between the terms 'recklessly' and 'negligent', as usually defined, is one of kind, rather than of degree. Each actor creates a *risk* of harm. The reckless actor is *aware* of the risk and disregards it; the negligent actor is *not aware* of the risk but should have been aware of it.

*State v. Pinero,* 70 Haw. 509, 522 n. 7, 778 P.2d 704, 713 n. 7 (1989) (citations omitted).

There is nothing in the record that directly or inferentially proves that Minor possessed the requisite culpable state of mind, *i.e.*, that he was aware that his words or conduct created a risk that Kuewa would be terrorized. Particularly in light of Kuewa's testimony that he said that Minor was previously acting out like a "little girl," the couch-rant described by Kimitch might best be described as a temper tantrum by a frustrated and foul-mouthed kid who was reacting, albeit inappropriately, to what he perceived as unjustified, unfair punishment. For reasons that are not of record, Minor was housed at a shelter for youth experiencing some sort of crisis. He was *aware* that he was not free to leave; he was just given EBT for going out-of-bounds. He was *aware* that raising his voice and yelling, like he had done the previous evening, was also cause for punishment. The evidence is that he just sat there, punching the couch, carrying on with curse words and adolescent taunts about how he would show whose dick was bigger, how he was going to get Kuewa for punishing him. Notwithstanding the caustic and hyperbolic language he used, there is simply no evidence that could reasonably support a conclusion that Minor was aware of anything but his own childish feelings about the circumstances.

There is also no evidence in the record to support a conclusion that, in light of his couch-tantrum, Minor was aware that his "aggressive" approach to question Kuewa about his additional EBTs would risk terrorizing Kuewa. As the Family Court clarified, that incident alone did not communicate a threat. As discussed above, there is no evidence that Minor was aware that his couch-rant created a risk that it might cause Kuewa to fear bodily harm. There is no evidence whatsoever that Kimitch expressed concern or alarm to Minor that the couch-rant might cause Kuewa to be fearful. Kimitch simply told Minor that he could not go to the beach until he stopped. Minor stopped. They went to the beach. When they returned, Minor angrily confronted Kuewa for an explanation, but without getting close enough to hit him, without raising his voice, and without further incident. The evidence in the record, including all reasonable inferences, is not sufficient to support the conclusion that Minor possessed the requisite reckless state of mind.

■ Nor can we conclude, in light of *Chung* and *Valdivia,* that there is sufficient evidence that Minor uttered a "true threat" that he intended to inflict bodily harm on Kuewa. As explained repeatedly by the supreme court, an alleged threat, whether by words or conduct or both, must be a "true threat" to withstand constitutional scrutiny and thereby form the basis for penal responsibility. In *Chung*, in a series of at least four separate incidents, the defendant repeatedly expressed his intention of shooting or killing the principal. He did so at the school where they both worked. He displayed a loaded handgun and/or ammunition while he uttered his threats. The threats were viewed as "sufficiently unequivocal, unconditional, im-

---

**10.** Minor also posits that he was not deliberately speaking with Kimitch and therefore he did not actually "communicate" any threat against Kuewa to a third party. This argument is meritless. *See Chung,* 75 Haw. at 412, 862 P.2d at 1071 (threat must be "conveyed to either the person who is the object of the threat or to a third party"; a crime is not committed "until the threat is heard by one other than the speaker.") (emphasis altered).

mediate, and specific as to convey a gravity of purpose and an imminent prospect of execution," as amply demonstrated by the facts that his fellow teachers were immediately alarmed enough to report the matter, Chung was in possession of a concealed handgun at school at the time of his arrest, and his presence at school was unauthorized.

Contrast that with the facts of this case. A frustrated youth, whose childish actions have been compared to that of a "little girl," sits (one time) punching a couch cursing obscene, over-the-top, threats to an adult who is not present. When told he cannot go to the beach unless he stops, he stops. Kimitch evidenced no immediate alarm and took Minor to the beach. Even after viewing Minor's "aggressive" approach to Kuewa, Kimitch simply went inside to drop his keys, check his messages, and get ready for dinner, before conveying Minor's "threat" to Kuewa. The "aggressive" approach to Kuewa is not evidence of a true threat and, in fact, demonstrates a lack of "gravity of purpose" in the prior threat. Minor did not threaten, yell, or curse at Kuewa. He did not get too close to him. Minor angrily demanded an explanation, which is well within the bounds of free expression, and less than thirty seconds later, he walked away, into the Shelter. The contrasts with the facts and circumstances of *Valdivia* are equally stark.

Finally, the fact of Minor's size, in light of the testimony that Kuewa was three to four inches taller and roughly fifty pounds heavier, does not "convey a gravity of purpose and an imminent prospect of execution" of Minor's alleged threat. Notably, although not dispositive, Kuewa primarily expressed concern about a possible "altercation," as opposed to fear of bodily injury.

Since there was insufficient evidence of a "true threat," as well as insufficient evidence that Minor possessed the requisite culpable state of mind, there was insufficient evidence that Minor violated HRS § 707–717.

Minor's other points on appeal are moot.

## IV. CONCLUSION

For these reasons, the Family Court's January 4, 2013 Decree is reversed.

**Dissenting Opinion by NAKAMURA, C.J.**

In reviewing the sufficiency of the evidence, we must consider the evidence in the light most favorable to the prosecution. *State v. Batson*, 73 Haw. 236, 248, 831 P.2d 924, 931 (1992).

> The test on appeal is not whether guilt is established beyond a reasonable doubt, but whether there was substantial evidence to support the conclusion of the trier of fact. Indeed, even if it could be said in a bench trial that the conviction is against the weight of the evidence, as long as there is substantial evidence to support the requisite findings for conviction, the trial court will be affirmed.

*Id.* (citations omitted). In a bench trial, the trial court, as the trier of fact, "is free to make all reasonable and rational inferences under the facts in evidence, including circumstantial evidence." *Id.* at 249, 831 P.2d at 931. It is the province of the trial court, not the appellate courts, to determine the credibility of witnesses and the weight of the evidence. *State v. Eastman*, 81 Hawai'i 131, 139, 913 P.2d 57, 65 (1996).

Applying this standard of review, I believe there was sufficient evidence to support the Family Court's adjudication of Minor–Appellant PP (Minor) as a law violator for having engaged in conduct constituting second-degree terroristic threatening. Accordingly, I respectfully dissent.

### I.

After a bench trial, the Family Court adjudicated Minor to be a law violator for committing what would be second-degree terroristic threatening, in violation of Hawaii Revised Statutes (HRS) § 707–717 (1993), if committed by a person over the age of eighteen at the time of the offense.

HRS § 707–717(1) provides that "[a] person commits the offense of terroristic threatening in the second degree if the person commits terroristic threatening other than as provided in section 707–716 [(the section which defines the offense of first-degree ter-

roristic threatening)]."[1] HRS § 707–715 (Supp.2013), in turn, defines the offense of terroristic threatening in relevant part as follows:

A person commits the offense of terroristic threatening if the person threatens, by word or conduct, to cause bodily injury to another person or ... to commit a felony:

(1) With the intent to terrorize, or in reckless disregard of the risk of terrorizing, another person[.]

## II.

"In the case of terroristic threatening, a threat becomes a crime only when it is coupled ... with a reckless disregard of the risk of terrorizing." *State v. Chung*, 75 Haw. 398, 412, 862 P.2d 1063, 1071 (1993) (internal quotation marks, brackets, ellipsis points, and citation omitted). "[T]o be subject to criminal prosecution for terroristic threatening, the threat must be conveyed to *either the person who is the object of the threat or to a third party*." *Id.* (block quote format altered; ellipsis points and citation omitted). "[A]ctual terrorization is not a material element of the offense of terroristic threatening." *Id.* at 413, 862 P.2d at 1071 (internal quotation marks and citation omitted). "The question is whether upon the evidence a reasonable trier of fact might fairly conclude that the defendant uttered his threats in reckless disregard of the risk of terrorizing another person." *Id.* (internal quotation marks, brackets, and citation omitted).

## III.

In my view, when viewed in the light most favorable to the State of Hawai'i (State), there was sufficient evidence to show that Minor uttered his threats in reckless disregard of the risk of terrorizing Jeffrey Kuewa

(Kuewa), a counselor at Central Oahu Youth Services (hereinafter, the "Shelter"). Kuewa had imposed additional discipline of two days of early bedtime on Minor for "screaming ... at the top of his lungs" after becoming "very angry" and walking outside of the Shelter's boundary. Kuewa noted the additional discipline in his report, but had not informed Minor of the discipline.

Frank Kimitch (Kimitch) worked at the Shelter along with Kuewa. Kimitch advised Minor that Kuewa had disciplined Minor for Minor's misconduct. In the presence of Kimitch and two Shelter clients, Minor engaged in a prolonged rant, lasting five or ten minutes, in which he threatened to kill and sexually assault Kuewa, when Kuewa "comes in." Minor emphasized his threats by punching the couch "with every breath and every statement" and "getting really aggressive." About an hour after Minor made these threats, Kimitch observed Minor angrily approach Kuewa with fists clenched and ask about the discipline.[2] Shortly after observing this encounter, Kimitch told Kuewa about the threats Minor had made against Kuewa.

The evidence showed that Minor conveyed the threats to a third party, Kimitch, in reckless disregard of the risk that Kimitch would communicate the threats to Kuewa. Kimitch and Kuewa were co-workers at the Shelter, and Minor's threats were related to Kuewa's performing his duties at the Shelter. Given the nature of Minor's threats against Kuewa, where the threats were made and the people who were present, the frequency of Minor's contact with Kuewa at the Shelter, Minor's punching the couch to emphasize his threats, Minor's angry encounter with Kuewa an hour after making the threats, and Kimitch's working relationship with Kuewa, Minor acted in reckless disregard of the risk that Kimitch would communicate Minor's

---

1. At the time relevant to this case, HRS § 707–716 (Supp.2012) provided that a person commits first-degree terroristic threatening if the person commits terroristic threatening: (1) by threatening another person on multiple occasions for a similar purpose; (2) by threats made in a common scheme against different persons; (3) against a public servant arising out of the performance of official duties; (4) against a medical services provider engaged in performance of

duty; (5) with the use of a dangerous instrument; or (6) by threatening another person protected by a court restraining order or a police order to leave the premises of the protected person, where such orders were issued against the person engaging in the terroristic threatening.

2. Kuewa had come to the Shelter on his day off when he was approached by Minor.

threats to Kuewa in order to warn Kuewa about the potential danger.

The evidence also showed that Minor recklessly disregarded the risk that his threats would terrorize Kuewa. The Family Court found that Minor, who was sixteen years old when the threats were made, was "roughly five (5) feet and eleven (11) inches tall, stocky and muscular, and capable of causing physical injury to Mr. Kuewa[.]"[3] Given the nature, context, and surrounding circumstances of Minor's threats, as described above, there was substantial evidence to support the Family Court's determination that Minor acted in reckless disregard of the risk that his threats would terrorize Kuewa. *See State v. Batson,* 73 Haw. 236, 254, 831 P.2d 924, 934 (1992).[4] Indeed, when Kimitch told Kuewa about Minor's threats, Kuewa had "big concerns [about] returning to work[.]" Kuewa "got nervous" that a "physical, violent altercation" with Minor was "highly possible" and was afraid that an altercation was "[h]ighly likely to happen," and Kuewa called the police after speaking to his supervisor. Kuewa was "[d]efinitely" concerned for his personal safety.[5]

## IV.

In my view, there was also sufficient evidence to show that Minor's threats were "true threats."

To avoid infringing on First Amendment protections, the Hawai'i Supreme Court has required that a defendant's remarks constitute "true threats" to be the subject of prosecution. In *Chung,* the court stated that "[a] statement that amounts to a threat to kill would not be protected by the First Amendment." *Chung,* 75 Haw. at 415–16, 862 P.2d at 1072 (internal quotation marks, brackets, and ellipsis points omitted). The court described the types of statements that could be prosecuted as "true threats" as follows:

> The word "threat" excludes statements which are, when taken in context, not "true threats" because they are conditional and made in jest. Threats punishable consistently with the First Amendment are only those which according to their language and context conveyed a gravity of purpose and likelihood of execution so as to constitute speech beyond the pale of protected "vehement, caustic and unpleasantly sharp attacks."

> Proof of a "true threat" focuses on threats which are so unambiguous and have such immediacy that they convincingly *express* an *intention* of being carried out.

> So long as the threat on its face and in the circumstances in which it is made is so unequivocal, unconditional, immediate and specific as to the person threatened, as to convey a gravity of purpose and imminent prospect of execution, the statute may properly be applied.

*Id.* at 416–17, 862 P.2d at 1072–73 (brackets, ellipsis points, and citations omitted).

In *State v. Valdivia,* 95 Hawai'i 465, 24 P.3d 661 (2001), the court rejected Valdivia's underlying contention that "the 'imminency' required to establish a 'true threat' is constitutionally restricted to *temporal* immediacy, such that a 'threat' is a 'true' one only if it can be executed 'without lapse of time or delay,' 'instantly,' or 'at once.'" *Valdivia,* 95

---

3. Kuewa testified that he was six feet two inches tall and weighed 260 pounds and estimated that Minor was five feet nine or ten inches tall and weighed 210 pounds. The Family Court had the opportunity to observe both Kuewa and Minor in court in finding that Minor was "capable of causing physical injury to [Kuewa]."

4. In *Batson,* the Hawai'i Supreme Court stated:

> Given the difficulty of proving the requisite state of mind by direct evidence in criminal cases, we have consistently held that proof by circumstantial evidence and reasonable inferences arising from circumstances surrounding the defendant's conduct is sufficient. Thus, the mind of an alleged offender may be read from his acts, conduct and inferences fairly drawn from all the circumstances.

*Batson,* 73 Haw. at 254, 831 P.2d at 934 (internal quotation marks, brackets, and ellipsis points omitted); *see also State v. Kiese,* 126 Hawai'i 494, 502, 273 P.3d 1180, 1188 (2012) (noting that criminal intent "can rarely be proved by direct evidence" (format altered; citation omitted)).

5. Kuewa testified as follows:

> [Deputy Prosecuting Attorney:] Q. Were you concerned for your personal safety if [Minor] had still been (indiscernible) when you returned the next day?
> [Kuewa:] A. Definitely.

Hawai'i at 476, 24 P.3d at 672 (brackets and citation omitted). Valdivia was under arrest, with his hands handcuffed behind his back, and guarded by two armed police officers when he threatened to kill Officer Kawelo and "[his] police uniform." *Id.* at 471, 474, 24 P.3d at 667, 670. Valdivia argued that given these circumstances, his remarks did not constitute "true threats" because "there was 'no realistic prospect that he would imminently execute the literal words of his remark or that he had the ability to do so.'" *Id.* at 474, 24 P.3d at 670 (brackets omitted). In rejecting Valdivia's argument, the court clarified *Chung* and explained that the free speech clause of the United States and Hawai'i Constitutions did not "impose a temporal 'immediacy' requirement that must be met before words become subject to criminal prosecution as 'true threats.'" *Id.* at 476, 24 P.3d at 672.

The court stated:

> We agree with the California Supreme Court that the "imminency" required by *[United States v.] Kelner,* [534 F.2d 1020 (2d Cir.1976)], and hence by *Chung,* can be established by means other than proof that a threatening remark will be executed immediately, at once, and without delay. Rather, as a general matter, the prosecution must prove that the threat was objectively susceptible to inducing fear of bodily injury in a reasonable person at whom the threat was directed and who was familiar with the circumstances under which the threat was uttered. Of course, one means of proving the foregoing would be to establish, as in *Chung* and *Kelner,* that the threat was uttered under circumstances that rendered it "so unequivocal, unconditional, immediate, and specific as to the person threatened, as to convey a gravity of purpose and imminent prospect of execution." <u>But another would be to establish that the defendant possessed "the apparent ability to carry out the threat," such that "the threat would reasonably tend to induce fear of bodily injury in the victim."</u>
>
> <u>In light of the foregoing, Valdivia's argument that his utterances lacked the requi-</u><u>site "immediacy" because, at the time, he was handcuffed misses the mark, being no more than an assertion that there was no possibility of the threatened evil being accomplished at the instant of its expression.</u> Given the evidence that pepper spray had little or no effect on Valdivia's power of resistance and that it required four police officers to physically apprehend him, the jury could find that Valdivia possessed the apparent ability to carry out his threat and that the threat would reasonably tend to induce fear of bodily injury in Officer Kawelo. Accordingly, we hold that [the] prosecution adduced substantial evidence from which a person of reasonable caution could conclude that Valdivia, in fact, uttered a "true threat."

*Id.* at 477, 24 P.3d at 673 (brackets, ellipsis points, and citations omitted; emphases added).

In other words, the court in *Valdivia* held that even if the defendant lacked the ability to carry out the threat immediately, the threat would still constitute a "true threat" if the defendant's apparent ability to carry out the threat sometime in the future would reasonably tend to induce fear of bodily injury in the victim. The focus is on whether given the substance and context of the threat, it would reasonably tend to induce fear of bodily injury in the victim.

Here, as the Family Court found, the evidence showed that Minor was "capable of causing physical injury to Mr. Kuewa," and that "Mr. Kuewa was justified in fearing physical injury from the Minor." Both Kimitch and Kuewa, who were familiar with Minor, took Minor's threats seriously.[6] Kimitch warned Kuewa of Minor's threats after Kimitch observed Minor angrily confront Kuewa about the discipline Kuewa had imposed. Upon learning about Minor's threats, Kuewa became afraid of a violent, physical altercation with Minor, which he believed was "highly possible." Kuewa had "big concerns" about returning to work and was afraid that an altercation with Minor was "[h]ighly likely to happen." Kuewa called the police and was

---

6. Kimitch and Kuewa both had extensive experience working at the Shelter. Kuewa testified that he had worked at the Shelter for eight years, and Kimitch testified that he had worked at the Shelter for ten years.

concerned for his personal safety. When viewed in the light most favorable to the State, I believe there was sufficient evidence to show that Minor "possessed the apparent ability to carry out his threat, such that the threat would reasonably tend to induce fear of bodily injury in [Kuewa]." *See Valdivia,* 95 Hawai'i at 477, 24 P.3d at 673 (internal quotation marks, ellipsis points, and brackets omitted).

## V.

For the foregoing reasons, I believe there was sufficient evidence to show that Minor uttered his threats in reckless disregard of the risk of terrorizing Kuewa and that Minor's threats were "true threats." Therefore, I respectfully dissent from the majority's conclusion that there was insufficient evidence to support the Family Court's adjudication of Minor as a law violator in this case.